

FILED

SEP 24 2019

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Jared Sullivan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for the following properties (herein after collectively referred to as the "Target Locations") and one cellular telephone (herein after referred to as the "Target Telephone"):

**Target Location #1: 414 E. Watauga Ave, Johnson City, TN (American Toxicology Labs)** – A free standing building that appears to originally have been a residential dwelling, but is now used for commercial purposes. It is a three-story building with white siding and a dark roof. The numbers "414" are displayed directly over the front door. It is positioned at the corner of E. Watauga Avenue and Baxter Street. There is a concrete driveway behind the building. Photographs of the building have been attached and labeled "Attachment A." The items sought for seizure are described in "Attachment B."

**Target Location #2: 113 Sterling Springs Drive, Johnson City, TN (Residence of Michael Dube)** – A single family residential dwelling with brown brick and black shutters, and an attached three-car garage and storage containers in the driveway. The residence is positioned well off Sterling Springs Drive and has a long driveway. At the street, to the left of the driveway, there is a brick mailbox with an attached plate that reads "113 Sterling Springs Dr." Photographs of the residence have been attached and labeled "Attachment C." The items sought for seizure are described in "Attachment D."

**Target Telephone: Assigned Phone Number (423) 946-4303 and Utilized by Michael Dube** – According to records obtained from AT&T, this cellular telephone is subscribed to "American Toxicology Lab" of "113 Sterling Springs Dr, Johnson City, TN 37604". A full description of this phone is included in "Attachment E." The information sought for seizure are described in "Attachment F."

2.     I am a Special Agent (SA) with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been so employed since March 2006. I am a federal law enforcement officer who is engaged in enforcing the criminal drug laws and authorized to request a search warrant by the Attorney General. I am currently assigned to Lexington, Kentucky Resident Office, Tactical Diversion Squad, and have been since February 2011. Prior to my employment with DEA, I was a sworn police officer in the State of Ohio for approximately 2 years. During my tenure with DEA, I have participated in numerous investigations involving violations of federal drug laws. I have attended training related to, and been instructed in many aspects of, narcotics investigation and am familiar with the provisions of Title 21 of the United States Code. I have initiated or participated in both physical and electronic surveillance; the debriefing of numerous drug dealers, drug users, and informants regarding the methods of drug trafficking operations, efforts utilized to avoid detection, and the means and manner utilized to conceal their illegal profits; executed search warrants; and analyzed records documenting the purchase and distribution of illegal drugs.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents/officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

2

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that American Toxicology Labs, owed by Dr. Michael Dube, has been involved in possible violations of Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances), and Title 18, United States Code, Sections 1347 and 1349 (Health Care Fraud and Conspiracy to Commit Health Care Fraud) (collectively, "Target Offenses").  Furthermore, there is probable cause to believe that a search of the Target Locations and Target Telephone will result in the seizure of evidence related to the Target Offenses, more fully described in the aforementioned attachments.

## OVERVIEW OF FEDERAL CONTROLLED SUBSTANCE LAWS

5.     Under 21 U.S.C. § 841(a)(1), it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" unless otherwise authorized by law.  In turn, conspiring with another to unlawfully distribute or dispense a controlled substance is a violation of 21 U.S.C. § 846.

6.     Certain professionals, including doctors and pharmacists, are authorized to dispense controlled substances, *see* 21 C.F.R. § 1306.03-06, but only so long as they comply with federal law, including the regulations promulgated pursuant to 21 U.S.C. § 821.

3

7.      Under those regulations, "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04.

8.      The prescribing practitioner is responsible for the proper prescribing and dispensing of controlled substances. A prescription issued outside the usual course of professional treatment is not a valid prescription within the meaning and intent of the Controlled Substances Act. *See* 21 U.S.C. § 829. Any person knowingly issuing such a prescription shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

## BACKGROUND ON BUPRENORPHINE

9.      Buprenorphine is an opioid partial agonist and is classified as a Schedule III controlled substance. Buprenorphine, like other opioids, produces effects such as euphoria and respiratory depression. Naloxone, an opioid antagonist, is often paired with buprenorphine to decrease the likelihood of diversion and misuse of the combination drug product. Brand name drugs containing buprenorphine include Suboxone, Subutex and Zubsolv.

10.     The Drug Addiction Treatment Act of 2000 (DATA 2000) enables qualified physicians to treat opioid addiction with Schedule III, IV, and V narcotic opioid medications that have been specifically approved by Food and Drug Administration (FDA) for the treatment of opioid dependency. *See* 21 C.F.R. § 1301.28. The physician

4

must be specifically registered with the DEA to permit the treatment of opioid dependency, which requires a valid state medical license, a valid DEA registration, and a specialty or subspecialty certificate in addiction. These physicians are often called "DATA waived" physicians. Because only one narcotic medication in Schedules III-V has FDA approval for the treatment of opioid addiction, "DATA waived physicians" typically refers to providers who prescribe buprenorphine for the treatment of addiction.

11.     Federal law limits the total number of patients a physician can treat at one time with buprenorphine. Currently, the maximum number of patients a physician can treat is 275, although physicians must have held a waiver to treat 100 patients for at least one year before the physician is eligible to treat 275 patients.

12.     I know from my training and experience that buprenorphine is a frequently abused prescription medication in the United States and is often resold on the illicit street market for profit. I also know that buprenorphine abusers often take the drug at the same time as a benzodiazepine (such as Valium or Xanax) and/or gabapentin (Neurontin). Investigators know that addicts have claimed these combinations increase the "high" experienced by users, which makes these combinations specifically desirable to drug abusers.

13.     Due to this increased likelihood of abuse and diversion, Kentucky's regulations setting forth the professional standards for physicians who prescribe buprenorphine address the concurrent prescribing of buprenorphine and benzodiazepines:

5

Except as provided in paragraph (b) of this section, Buprenorphine-Mono-Product or Buprenorphine-Combined-with-Naloxone shall not be prescribed or dispensed to a patient who is also being prescribed benzodiazepines, other sedative hypnotics, stimulants or other opioids, without consultation of a physician who is certified by the American Board of Addiction Medicine, the American Board of Medical Specialties (ABMS) in psychiatry, or an American Osteopathic Association (AOA) certifying board in addiction medicine or psychiatry.

(b) A physician may prescribe or dispense Buprenorphine-Mono-Product or Buprenorphine-Combined-with-Naloxone to a patient who is also being prescribed benzodiazepines, other sedative hypnotics, stimulants, or other opioids, without consultation in order to address an extraordinary and acute medical need not to exceed a combined period of thirty (30) days.

201 Ky. Admin. Reg. 9:270. This regulation significantly limits the availability of this diversion-susceptible combination of drugs in Kentucky, increasing the desirability of that combination if made available in a neighboring state.

14. Effective January 1, 2014, Kentucky Medicaid began covering buprenorphine medications, as well as substance abuse-related treatment, such as behavioral treatment and associated office visits. Accordingly, Kentucky's Medicaid program covers the cost of a buprenorphine prescription and associated office visits if the physician writing the prescription is an approved and enrolled Medicaid provider. Because some providers continued charging Medicaid patients directly for these services (i.e., charging the patients out-of-pocket rather than billing Medicaid), Kentucky's Cabinet for Health and Family Services, Department of Medicaid Services issued a

6

"Policy Clarification" on March 20, 2015, making clear that providers cannot charge Medicaid patients directly (*i.e.*, charge patients cash) for buprenorphine treatment. *See also* 907 KAR 3:005.

## OVERVIEW OF MEDICARE AND MEDICAID

15.    The Medicare Program ("Medicare") is a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provides benefits to persons who are over the age of sixty-five or disabled.  Medicare is administered by HHS through its agency, the Centers for Medicare & Medicaid Services ("CMS").

16.    Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part D is an optional benefit, and is available, at additional cost, to beneficiaries who are entitled to receive benefits under Medicare Part A or Part B.

17.    The Kentucky Medicaid Program ("Medicaid") is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), which provides benefits to low-income residents who meet certain eligibility requirements. Medicaid is jointly funded by federal and state sources and administered by the CMS and by the Kentucky Cabinet for Health and Family Services, Department for Medicaid Services.

18.     Individuals who qualify for Medicaid benefits are commonly referred to as "members," and as members, they are eligible to receive hospital services, physician services, and prescription drug benefits at no or low cost.

19.     Both Medicare and Medicaid cover outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, including urine drug testing ("UDT"), among a variety of other items and services.

20.     Medical service providers, including clinics and physicians ("providers"), meeting certain criteria can enroll in and obtain Medicare and Medicaid provider numbers, which allow them to submit claims to Medicare and Medicaid, seeking reimbursement for the cost of services provided to beneficiaries and members.

21.     When seeking reimbursement, providers certify that: (1) the contents of the claims form are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare and Medicaid; and (3) the services purportedly provided, as set forth in the claims, are medically necessary. If services performed by providers are not medically necessary, they are not appropriately reimbursable by Medicare and Medicaid.

22.     Medicare and Medicaid require service providers to retain medical and other documentation supporting claims for services at their premises and produce these documents upon request.

## CPT CODES & UDT

23.    In order to receive payment from Medicare and Medicaid, providers are required to submit health insurance claim forms either in hard copy or electronically. When seeking reimbursement from Medicare and Medicaid, providers submit the cost of the service provided together with the appropriate "procedure code," as defined by the American Medical Association, and set forth and maintained in the Current Procedural Terminology ("CPT") Manual. Although providers submit the cost of the service provided, together with other information, Medicare and Medicaid reimburse providers designated, specific amounts according to the CPT code utilized.

24.    Both Medicare and Medicaid reimburse providers directly for the cost of UDT furnished to eligible beneficiaries and members, provided the UDT is medically necessary.

25.    UDT is divided into two categories: presumptive (qualitative) testing and definitive (quantitative) testing. Presumptive testing identifies which substances, if any, are present in the provided specimen. Definitive testing identifies how much of a particular substance is present in the provided specimen.

26.    Presumptive testing is performed in a variety of ways, including utilizing devices that are capable of being read by direct optical observation, such as "dipsticks" or "cups" that react to the specimen and identify which drugs, if any, are present ("optical

9

devices"), as well as by more complex testing performed by instrument chemistry analyzers.

27.     Definitive testing is performed by higher complexity instrument chemistry analyzers.

28.     Medicare and Medicaid, in certain instances, consider presumptive testing to be medically necessary, and appropriately reimbursable, in the treatment of drug addicts.  Moreover, Medicare and Medicaid consider medically necessary, and therefore appropriately reimbursable, definitive testing of substances that produced unexpected results during presumptive testing.  Conversely, routine definitive testing of substances that did not yield unexpected results during previous presumptive testing is not medically necessary and is not appropriately reimbursable by Medicare and Medicaid.

29.     As of January 1, 2017 presumptive drug testing is reported with CPT codes 80305-80307.[1]  These codes differ based on the level of complexity of the testing methodology, and are reimbursed at different rates—the more complex the test, the greater the reimbursement.  CPT codes 80305 and 80306, typically indicate that optical devices were used to perform presumptive testing. Conversely, CPT code 80307, as it is

_____

[1] From January 1, 2016 and continuing through December 31, 2016, these same codes were previously designated with CPT codes G0477-G0479, respectively.

10

reimbursed at a higher rate that CPT codes 80305 and 80306, indicates that a higher complexity analyzer was used to perform the presumptive testing.

30.     As of January 1, 2016, definitive drug testing is reported with CPT codes G0480-G0483.  These codes differ based on the number of drug classes, including metabolites, tested, and are reimbursed at different rates—the more drugs tested, the greater the reimbursement.

## UDT & CLIA CERTIFICATION

31.     Providers, including physicians and clinics, can perform and seek reimbursement for UDT.  However, for UDT, beyond tests performed by optical devices, to be reimbursable by Medicare and Medicaid, providers are required to perform UDT in laboratories with machines, instruments, and analyzers that comport with the Clinical Laboratory Improvement Amendments of the Public Health Services Act ("CLIA regulations").  *See generally* 42 U.S.C. § 263a.

32.     Generally, CLIA regulations establish quality standards for laboratory testing performed on specimens, such as blood, body fluid, and tissue, for the purpose of diagnosis, prevention, or treatment of disease, or assessment of health.  *See* 42 U.S.C. § 263a(a).

33.     Through an accreditation body ("CLIA"), laboratories are certified and receive certificates of accreditation indicating that the laboratories comport with CLIA

regulations, and can perform tests up to their accreditation level—the more complex the test performed, the higher the accreditation level needed ("CLIA certified" or "CLIA certification"). *See* 42 U.S.C. § 263a(b) and (c).

34.    In order for the UDT billed under CPT codes 80307 (presumptive testing) and G0480-G0483 (definitive testing), the UDT must be performed in a CLIA certified laboratory.

## PROBABLE CAUSE

*Background of Investigation of Express Health Care (EHC)*

35.    The Kentucky Attorney General's Office and the DEA have been conducting a joint investigation into EHC Medical, its owner, Robert E. Taylor, and others affiliated with EHC for suspected controlled substance and health care fraud violations.  The investigation indicates that physicians working at EHC clinics have repeatedly distributed Suboxone (a buprenorphine drug product) and other controlled substances outside the scope of professional practice and not for a legitimate medical purpose.

36.    EHC Medical, with locations at 2305 N. Gateway Avenue, Suite 4, Harriman, Tennessee and 114 Perkins Lane, Jacksboro, Tennessee, was a narcotic treatment program ("NTP") focusing on opioid dependency.  In addition to purporting to provide dependency assessment and counseling, the clinic prescribed buprenorphine.

12

37.    In December 2018, the convert portion of the DEA investigation of EHC concluded with search warrants being executed at both EHC locations, as well as the residences of Dr. Taylor (EHC's owner) and the supervising physicians, Dr. Evann Herrell and Dr. Mark Grenkoski.  Prior to the execution of the search warrants, investigators learned that Dr. Taylor sold EHC Medical in November 2018 although the practice appeared to be unchanged up until the search warrants were executed. Investigators later found that EHC was sold to "Crossroads" and the EHC Medical locations changed names shortly thereafter.  The investigation into the historic activities of EHC Medical has continued, including through data analysis and witness interviews.

38.    This affidavit sets forth the factual basis for the requested seizure warrant, but does not attempt to detail the evidence uncovered in the broader investigation of EHC and related individuals.  Instead, I hereby incorporate the facts set forth in the affidavit I previously submitted to the Court on December 12, 2018, in support of an application for several search warrants in this investigation.  *See* 3:18-MJ-2202.

39.    During the investigation into EHC, investigators learned that EHC used American Toxicology to conduct its UDT.   Following the execution of the search warrants, investigators obtained over three hundred complete EHC patient files from the new ownership (Crossroads), pursuant to a Grand Jury Subpoena.  Those patient files corroborated that American Toxicology, among other laboratories, was being utilized to perform UDTs on EHC patients.  Investigators have since been investigating the

13

administrative and billing practices that were collectively being practiced by EHC and American Toxicology.

*Background of Dr. Michael Dube*

40.     I know from a search of the Tennessee Secretary of State public website that "American Toxicology Labs, LLC" is an active business, and has been since May 2013.  The "Principal Office" and "Mailing Address" are both "113 Sterling Springs Dr, Johnson City, TN".  The "Registered Agent" is "Regan Dube" of "113 Sterling Springs Dr, Johnson City, TN".  I know that Regan Dube is the current wife of Dr. Michael Dube and that both Regan and Michael maintain a primary residence at 113 Sterling Springs Dr, Johnson City, TN.

41.     I have reviewed public court records from Tennessee regarding Dr. Dube's divorce from his previous wife.  In approximately 2002, a filing made on behalf of his ex-wife states, "Early in the marriage and while living in Florida, Husband had a drug problem and eventually began selling drugs.  When some of Husband's friends started getting arrested, they decided to move to a different part of Florida.  After this move, Husband began growing and selling marijuana, Husband eventually was arrested and received probation."  According to that filing, the Dubes eventually moved to Tennessee and Michael Dube later went to medical school and became a physician.

14

42.     Based on DEA records, I know Dr. Dube was investigated for "writing excessive prescriptions for hydrocodone and other controlled substances in 2006. In 2007, Dr. Dube's Medical License was placed on probation for improper prescribing. In 2009, Dr. Dube admitted to self-administering hydrocodone and surrendered his DEA registration for cause. In 2010, Dr. Dube was arrested by the DEA for charges that included obtaining hydrocodone by misrepresentation, fraud and forgery. Dr. Dube later pleaded guilty to charges of: "Failure to maintain records required by the controlled substance act" and "Making a false statement to a federal agency". As part of a plea agreement, Dr. Dube received 5 years of probation and a $25,000 fine.

43.     Investigators have learned through multiple interviews and reviewing business and financial records that Dr. Dube is now the owner of many medical-related businesses including American Toxicology Labs and several medical clinics that specialize in addiction treatment.

*Relationship between Dr. Taylor (EHC) and Dr. Dube (American Toxicology)*

44.     Through multiple interviews in this investigation, including two former EHC physicians, I have learned that Dr. Taylor and Dr. Dube are longtime friends/associates. During an interview with Dr. Keri McFarlane, a former EHC physician/supervisor, she described Dr. Dube and Dr. Taylor as "really good friends". Dr. McFarlane told investigators that Dr. Dube got Dr. Taylor started in the addiction treatment field. Dr. McFarlane said that EHC was using Dr. Dube's lab, American

15

Toxicology, to perform the UDT from early in EHC's existence. Dr. McFarlane said she knew American Toxicology was billing patients' insurance/Medicaid, however she did not understand how the clinic (EHC) could charge cash yet the UDT were billed to insurance/Medicaid. In an interview with Dr. Michael LaPaglia, a former EHC physician, he said Dr. Taylor and Dr. Dube were good friends and went through residency together. Dr. Lapaglia stated that Dr. Dube and Dr. Taylor smoke marijuana together and fish together. (Note: Dr. Lapaglia also said he, himself, has smoked marijuana with Dr. Taylor. Furthermore, investigators located approximately an ounce of marijuana at Dr. Taylor's residence when executing a search warrant in December 2018 and Dr. Taylor admitted to smoking marijuana regularly.) Dr. Lapaglia said American Toxicology bills insurance (primarily government subsidized plans) for the EHC urine analysis. He said American Toxicology makes so much money from billing for those samples that the lab can afford to receive no payments for the samples collected from non-insured EHC patients.

45.    I know from discussions with EHC employees that American Toxicology and EHC were very closely linked and American Toxicology maintained an employee inside each of the EHC locations. Through discussions with EHC employees and American Toxicology employees, I know that EHC (specifically Lori Barnett who was the Facility Director at EHC and Dr. Taylor's girlfriend) had a role in hiring the American Toxicology employees that sat inside EHC.

16

46.    On December 13, 2018, myself and other investigators conducted lengthy consensual interviews with Dr. Taylor and Lori Barnett at their home, during the execution of a search warrant at the residence.  Barnett told me that EHC used American Toxicology, "the whole time."  I asked both Dr. Taylor and Barnett (separately) how American Toxicology made money.  Barnett said she was unaware of how American Toxicology made income from the EHC UDT.  Barnett said, "I did no collections for them, I didn't talk money with them, we had no money exchanged with the lab, so however they get paid for their samples, I don't know."  Barnett confirmed that the lab did not collect money from EHC patients.  During the interview with Dr. Taylor, I asked him about the drug testing and he said it is done "completely separate".  He claimed that he could not remember the name of the lab and said investigators would have to ask Lori (Barnett).  He said he previously used Labcorp and Quest but has changed.  He said he doesn't know how the lab is paid and said, "I don't mess with any of that".  He said none of the cash collected by EHC (from patients) is provided to the lab for laboratory services.  When asked how the lab then makes money, Dr. Taylor said, "That's their doings, I truly don't know".  He said, "They don't like us much, because undoubtedly they don't make a lot of money".  He said he does not pay the lab anything and the lab does not pay him anything.  He said the onsite lab employees do not collect payments from the EHC patients.  When SA Sullivan said, "They must be billing the patient or insurance", Dr. Taylor agreed, "They have to be".  I believe the statements from Dr. Taylor were dishonest because, as detailed in the paragraphs below, Dr. Taylor and Dr. Dube are

17

known close associates and therefore it's disingenuous to say "They don't like us much" and therefore it is not believable that Dr. Taylor was not familiar with the name of Dr. Dube's lab (of which an employee sits in Dr. Taylor's clinic) nor the way in which that lab profits from its association with EHC. I believe Dr. Taylor's evasive comments regarding the lab (American Toxicology) was an attempt to deter investigators from detecting the alleged fraud that was occurring between the two businesses/friends.

47.     During the search warrant at Dr. Taylor's residence, I seized Dr. Taylor's cellular telephone. Dr. Taylor at first refused consent to search the phone but later said he would consent to the search after he learned the phone was going to be seized. Given the circumstances, I sought and obtained a search warrant for the phone. I have since reviewed some of the text messages on the phone between Dr. Taylor and Dr. Dube, who used the Target Telephone, (423) 946-4303. Those communications were frequent and date back to September 2012. The communications clearly indicate that Dr. Dube and Dr. Taylor were more than business associates, and that they were in fact close friends. During the communications, Dr. Dube and Dr. Taylor discuss personal matters as well as business matters. The messages reveal that the two vacation, attend parties and fish together and that they have known one another since at least the 1990s.

48.     As an example of the trusted nature of their friendship, during one of the text messages to Dr. Taylor, sent in September 2012, Dr. Dube boasted of an extra-marital relationship he was involved in and stated, "Hooters girl ETSU student. I help

18

her. She me. Please don't judge. I'm sorry"; Dr. Dube included a pornographic photograph of the female companion. In another text message, Dr. Dube wrote, "Poor nose is still trying to recover from the cocaine wars 1978 thru 1984 south Beach Miami".

49.     I know from financial records obtained from BB&T Bank, pursuant to a Grand Jury Subpoena, that Dr. Dube sent a personal check to Dr. Taylor, in the amount of $50,000. A notation on the check indicates the funds were a personal loan. The check was dated 12/21/18, approximately one week after investigators executed seizure warrants on many of Dr. Taylor's accounts. This further illustrates the close relationship between Dr. Dube and Dr. Taylor and corroborates that Dr. Taylor likely lied to investigators about not knowing details of the lab so closely aligned with EHC.

*Business-Related Communications between Dr. Dube and Dr. Taylor*

50.     Prior to Dr. Taylor opening a clinic, he wrote to Dr. Dube about his discontentment with his status as an ER doctor. On 10/21/12, Dr. Taylor wrote to Dr. Dube, "Hey mike, In Omaha getting ass kicked as I kiss patient ass. After or through holidays over lets get together and please Show me how to escape. I'm dying a slow brutal death in ER. Help me my friend!!" The text messages show that Dr. Dube provided frequent advice to Dr. Taylor regarding Dr. Taylor's start up and administration of a Suboxone/addiction clinic.

51.     It is clear from the messages that Dr. Taylor's primary motivation for opening a Suboxone clinic is the financial incentive. On 12/07/12, Dr. Taylor wrote Dr.

19

Dube a text message that included, "You ready to get me going Jan Feb, Fuck ER, I am ready to make $$, Fish, Travel, That's all:)".

52.    On 12/18/12, Dr. Taylor wrote, "Mike, I have done test and counting down days. Is there a legal loophole So I care for more than 30 Patients? 30 does not make $$." Dr. Dube responded, "Yes" and "Got u covered". Dr. Taylor then wrote, "OK, Thought you would." On 1/4/13, Dr. Taylor wrote, "Can't figure how to overcome the 30 pt max Crap. Is there a way?" Dr. Dube replied, "Yea ill tell u when u get here its easy." The texts reveal that Dr. Taylor and Dr. Dube then scheduled a meeting at Dube's residence for a "crash course" on getting Dr. Taylor's clinic started. Dr. Dube provided Dr. Taylor with the address of Target Location #2 as his residence, the location of the meeting. It is clear to me from the messages that Dr. Taylor feared the limitations of his new DEA registration that only allowed him to treat 30 patients for addiction during the first year. I believe the messages indicate Dr. Taylor feared the limitation would prevent him from turning a large enough profit and therefore he was seeking a "loophole" that would allow him to practice outside the scope of the limitations of his DEA registration. Based on the following, I believe Dr. Dube's solution involved treating some of the clinic's patients as "chronic pain" patients as opposed to "addiction patients", although in reality, all the patients received very similar prescriptions, primarily Suboxone, regardless if they were seen for "addiction" or "chronic pain". I know from interviewing former EHC employees and reviewing EHC patient files that this method was used at EHC for several years and it allowed EHC to see more patients that than the collective

20

physicians' DEA limitation numbers permitted. One previous employee I spoke to described this method as disingenuous because, in her opinion, all the patients at EHC were addicts. Later in the text message communications, Dr. Dube provided advice regarding advertising; he suggested that Dr. Taylor not use the words "chronic pain" because it would attract less desirable patients seeking Oxycodone. I believe this shows that Dr. Dube was aware that EHC was categorizing some of their patients as being treated for "pain" although all the patients were being treated with Suboxone as opposed to the pain patients being treated with other medications, such as Oxycodone.

53.　　After Dr. Taylor's clinic was opened, Dr. Dube continued to provide Dr. Taylor with frequent advice and the two discussed specific business practices/issues on a regular basis. Dr. Dube advised Dr. Taylor about the amounts he should charge patients and how the physicians should be paid. Dr. Dube and Dr. Taylor also discussed the hiring, placements and payments to American Toxicology employees that were located in the EHC clinics. The two also discussed medical dosing, for example on 5/20/14, Dr. Dube wrote, "Hey zubsove tid is only 170 ms equivalents per day. Won't get flagged."

54.　　The messages indicate that Dr. Dube referred some physicians to Dr. Taylor; some names that are specifically referenced include Dr. Stephen Cirelli, Dr. Robert Ferretti, and Dr. Greg Kesterson. In early 2013, it's apparent that Dr. Taylor needed to hire a physician. On 3/11/13, Dr. Taylor wrote a message that included, "Looks like I may need one in about 12 weeks. I'm going to start Looking now. Touch

21

base with your Knox contact and see if any broken mds In Knox to work. My guys are ER and will Go out and do on there on (SP), So I have avoided them thus far". On 3/12/13, Dr. Taylor wrote, "I need your wisdom and help. I need a broken doctor. At this rate And my next advertising blitz I will need one in about 12 weeks. So with the 45 day wait that means recruiting one within about 6 weeks. I can recruit a doctor from ER but they will take, copy and compete in a New York second. What to do?" These text messages further emphasis that Dr. Taylor was not focused on the quality of care his patients/customers would receive at EHC with a "broken" physician, but rather what was most advantageous for his business/financial aspirations.

55.     As Dr. Taylor's clinic opened and became successful, the communications between Dr. Dube and Dr. Taylor often involved the amount of money that was being made. On 2/22/13, Dr. Taylor wrote, "All ads, all office paid for in full in cash!! At top floor Hilton overlooking city, Grey goose on rocks, Superb smoke, A woman 14 yrs my younger and hot, Life is good. Thanks for your help." On 4/5/13, in a series of text messages, Dr. Dube wrote, "you may break 9000 today." Taylor responded, "7200". On 8/3/13, Dr. Taylor wrote, "Hey man Had a 20k day this week, 125k Month, Monday have 2 docs and 115 scheduled, Pulling myself off stage and placing the Other docs performing. Gladly Pay 1/3 to be off:) Got the fever for some snook in the mangroves and cravale ripping my line out.". On 8/5/13, Dr. Taylor wrote, "The office machine ran well today, 2 docs worked 32k:)." Taylor later added, "2 days, 54k:)))))". On 2/5/14, Dr. Taylor and Dr. Dube were discussing a physician "Todd" that was apparently going

22

through a difficult time and Dr. Taylor asked for Dr. Dube's assistance in keeping the struggling physician focused on the money to be earned. Dr. Taylor wrote, "I need him March 14 and 15, I have 100 people booked for him those two days (he will make 12.5k for 2 days)".

56. Throughout the communications, there is also a noted concern and distain for law enforcement and regulatory entities. On 1/14/13, Dr. Taylor wrote a text that included, "Local chief of police and x DEA will be issue. Next county over is the main market. 15 minutes down road. New hospital With new complex that left empty offices. Think I may need to set up shop one county over to avoid trouble and red flags." On 8/10/13, Dr. Taylor was in Washington DC and Dr. Dube recalled his previous problems with law enforcement. Dr. Dube wrote, "Shoot FBI and dea one for me! I'd really appreciate it". A review of text messages stored on a phone seized from Lori Barnett shows that on the following day, Barnett sent a photograph to Dr. Dube that depicted Barnett standing in front of a "J. Edgar Hoover FBI Building" sign while she displayed her middle finger. The body of that text reads, "This ones especially for you Mike! DEA to come soon!" Dr. Dube replied to Barnett, "My heart just doubled in size and electricity shot up then down my spine. Awesome!" On 6/21/14, Dr. Dube wrote to Dr. Taylor, "We avoid the pharmacy board witch hunt!!!! Screw these tn and ky boys." On 1/12/17, Dr. Dube wrote, "Tough times in Jc. I emailed Lori". He then added, "Watch local WJHL abc news about suboxone clinics not being compliant with new laws." On 8/24/17, Dr. Dube wrote Taylor about his concern that a nearby county had become a

23

"HIDTA area" and wondered if it would, "have any significant impact" on he and Taylor. I know from experience that HIDTA stands for High Intensity Drug Trafficking Area and one of its primary functions is to supply law enforcement in a designated area with additional resources to combat illegal drug activity.

57. In late 2013, discussion emerged regarding Dr. Dube starting a lab. On 12/16/13, Dr. Dube wrote, "Go live on tox lab today. Few weeks till we roll you in. Got to work out the bugs that will show up." Dr. Taylor replied, "Make it purr and rain, Congrats!" On 1/20/14, Dr. Taylor wrote, "How much longer am I going to send away so much Urine money? Significant money sucking away via Ups, Makes a fellow want to cry." Dr. Dube replied, "Yea. In am callin Nashville again for clia an tn liscence (sp). Everyone I talk to says same thing. Slow process." Dr. Taylor later wrote, "Mike we need to push Back visit by one week so I can let old lab people to clear out. Is that ok with you?" The messages reveal that shortly thereafter, Dube's lab began providing services to EHC for UDT. Lab needs and pricing then became on ongoing topic in the conversations. For example, on 10/19/14, Dr. Dube wrote, "The confirmation lab in Colorado owner call me yesterday. He is the one that Jason and George set us up with. The new lab said they want 10 percent self pay and that they too can't collect for Kentucky Medicaid. I feel that he is going to refuse to work with us. I'll know in am. I have an alternative plan."

24

58.     On 7/27/16, Dr. Dube wrote, "Any KY plans you want to get in network with? I have a meeting with the Medicaid commissioner and the secretary of health." On 3/16/18, Dr. Dube advised Dr. Taylor, "Do not see patients at all costs. Separate yourself from dictating policy except as described from state. Ninja." Dr. Taylor replied, "Agreed". I believe Dr. Dube was advising Dr. Taylor not to treat patients nor dictate the procedures at EHC and therefore limiting the liability/exposure which would then presumably fall on the practicing physicians.

*Concerning Practices/Billing Occurring between EHC and American Toxicology*

59.     As detailed in the incorporated affidavit, EHC was a cash-only business. However, I know from interviews of former EHC employees and through coordination with HHS, for several years EHC employees completed prior authorizations (PAs) for insurances, including Medicaid/Medicare, which allowed EHC patients to fill their prescriptions at pharmacies for a greatly reduced amount. This was a substantial incentive for EHC patients, and therefore EHC went to great lengths to continue this service. I have spoken to former EHC employees that detailed the coordination/efforts that EHC took to ensure that the PAs were approved, which included using physicians' pre-captured digital signatures to complete PAs in the names of Medicaid/Medicare approved EHC physicians, even on days those physicians did not work nor met with patients. Furthermore, former EHC employees have told me they coordinated with pharmacies to change the physicians' names on prescriptions that were issued by

25

physicians that were not Medicaid/Medicare approved (in Kentucky) to the names of physicians that were approved, although the later never actually met with the patient.

60.     I have spoken with Lee Guice, the Director of Policy & Operations for the Department of Medicaid Services, who has confirmed that these practices are outside of the regulations of Medicaid. EHC only discontinued this practice, in approximately 2016, after being notified by governing entities that it was outside of the regulations for Medicaid providers to treat Medicaid patients, yet charge cash for the office visits. Therefore, in order to continue charging cash for the office visits, EHC was forced to withdraw most of its physicians from Medicaid, and therefore the Medicaid PAs could no longer be completed (by providers no longer participating in Medicaid). During the investigation, investigators also learned and confirmed that EHC was issuing Benzodiazepine prescriptions in combination with Suboxone. As detailed in paragraph 13 above, Kentucky regulations placed special requirements on this type of prescribing. I know from interviews conducted and evidence collected during this investigation that due to the regulations, pharmacies in Kentucky demanded that a Board Certified Addiction Specialist from EHC prescribe the Benzodiazepine prescriptions that were issued along with Suboxone before the pharmacies would fill the prescriptions. To remedy this, our investigation revealed that the EHC patients were often given benzodiazepine prescriptions signed by a board certified physician who never actually met with the patient. In other words, patients were often seen by physicians who were not board certified, then given a benzodiazepine prescription signed by a different (certified)

26

physician who signed the prescription without seeing the patient. On occasions when a Kentucky patient accidently received a benzodiazepine prescription from a non-certified physician, EHC employees coordinated with Kentucky pharmacies to have the physicians' names changed on those prescriptions. These concerning behaviors are described more in-depth in the incorporated affidavit, however they are re-emphasized here to show that at EHC there was a culture that included the frequent changing of physicians' names on important documents, such as PAs and prescriptions, in an effort to appear compliant with regulations, even if the true focus was on retaining customers and increasing profits. I believe the paragraphs that follow demonstrate that additional concerning practices were occurring in regards to the billing of the UDT.

61.     I have coordinated with investigators from the Department of Health and Human Sservices ("HHS") during this investigation and have been provided with Medicaid/Medicare billing data from HHS. Based on discussions with HHS, I know that many of EHC's patients were on Medicaid, Medicare, and sometimes both. Regarding the patients that are on Medicare and Medicaid, I know billed services for those patients are primarily paid for by Medicare and then, at times, remaining amounts are funded by Medicaid.

62.     Based on the data provided by HHS, I know that American Toxicology submitted billing (to Medicaid/Medicare) for over 1,600 unique Kentucky patients between 2014 and early 2019. Those claims have resulted in over $4.9 million in

27

(Kentucky) Medicare funds provided to American Toxicology and over $1.5 million in (Kentucky) Medicaid funds provided to American Toxicology. It is important to note those figures do not include income American Toxicology received from private insurances and Tennessee Medicare/Medicaid plans for performing analysis for EHC.

63. Although investigators of the DEA and HHS continue to analyze the Medicare/Medicaid billing data, and a full scope of this behavior has not yet been determined, investigators have found examples of initial American Toxicology claims (for EHC patients) being denied and then the claims were re-submitted with different "referring provider" names which resulted in the claims being paid.

64. As previously referenced, effective January 1, 2014, Kentucky Medicaid began covering buprenorphine medications, as well as substance abuse-related treatment, such as behavioral treatment and associated office visits. Accordingly, Kentucky's Medicaid program covers the cost of a buprenorphine prescription and associated office visits if the physician writing the prescription is an approved and enrolled Medicaid provider. Because some providers continued charging Medicaid patients directly for these services (i.e., charging the patients out-of-pocket rather than billing Medicaid), Kentucky's Cabinet for Health and Family Services, Department of Medicaid Services issued a "Policy Clarification" on March 20, 2015, making clear that providers cannot charge Medicaid patients directly (*i.e.*, charge patients cash) for buprenorphine treatment. *See also* 907 KAR 3:005. I know from my discussion with Dr. McFarlane that EHC, including herself, got in trouble with Tennessee Medicaid in approximately 2016 for

28

continuing to charge cash for office visits in which Medicaid recipients were seen by Medicaid providers. Dr. McFarlane said the concerns from Medicaid resulted in EHC physicians, including herself, going before the Medical Board for their non-compliance with the regulations and EHC stopped this practice shortly thereafter. I have learned from multiple former EHC employees that instead of accepting Medicaid, Medicare, and other insurances, EHC unenrolled some of its providers from Medicare and Medicaid so that the clinic could continue charging Medicare and Medicaid patients cash. During my aforementioned discussion with Director Guice, of the Department of Medicaid Services, Director Guice conveyed that EHC's business practice, since its physicians withdrew from Medicaid, makes it impossible for the Medicaid billing of the UDTs to have been completed in a manner that is within regulations. Most noteworthy is that EHC began specifically avoiding the placement of Medicaid patients with Medicaid providers, in order to continue charging cash and avoiding further non-compliance with regulations for which they had already been reprimanded. Therefore, given that these Medicaid patients were not seen by Medicaid providers, it is a certainty that a Medicaid provider did not meet with the patient and establish the medical necessity for the urine testing. Director Guice said the provider, determining the medical necessity, must be enrolled in Medicaid. Director Guice also said Medicaid does not pay for labs requested by non-Medicaid providers. Therefore, my investigation suggests that after EHC physicians withdrew from Medicaid, American Toxicology could not have billed Medicaid for UDTs ordered by EHC's non-Medicaid providers. In other words, one can't avoid using a Medicaid

29

provider in order to charge cash for the visit, yet file for Medicaid to pay for the subsequent UDT associated with that patient visit. However, I have detailed below evidence that shows this is exactly what EHC and American Toxicology conspired to do. I believe EHC and American Toxicology operated outside the scope of accepted practices and regulations to ensure insurers paid for EHC's patients' UDTs.

65.      In March 2019, investigators interviewed a former EHC employee (EHC1) who performed administrative duties. EHC1 speculated that American Toxicology was doing insurance fraud, which involved changing physicians' names on the "pee forms". EHC1 was not sure if Dr. Taylor and Lori Barnett were aware of the suspected fraud but she knew they were good friends with Dr. Dube, the owner of American Toxicology. EHC1 was told when she was hired that the $375 (patient fee) included the cost of the drug screens and patients would not be billed. I have since learned from other patients that they are not aware of EHC paying any of the cash fee collected from EHC patients to American Toxicology for lab work. EHC1 recalled that she then learned that EHC patients were receiving bills for the urine testing, further confirming that the cash fee paid to EHC was not covering the cost of the UDTs. EHC1 then started noticing that TennCare (Tennessee's Medicaid program) doctor's names were being put on the billing for the urine labs even when other physicians (who were not affiliated with Medicaid), actually saw the patients. EHC1 continued working at the clinic following the sale to Crossroads. She said under the new ownership, Crossroads, "[t]he doctors sign the

30

requisition themselves", and they now keep copies of the requisitions to make sure the same physicians on the requisitions are the physicians that saw the patients.

66.    In March 2019, investigators interviewed a former American Toxicology employee (AT1) who worked inside EHC.  AT1 was also a former EHC employee. During her tenure as an employee at American Toxicology she reported daily to EHC and aided in collecting and processing urine samples for testing.  AT1 was fired from American Toxicology and referenced a disagreement she had with another employee. However, AT1 stated she, in part, believes she was fired because of her non-compliance with suspicious activity.  AT1 said she was told she was putting the "wrong doctor" on the paperwork, but in reality she was putting the name of the physician that actually met with the patient.  She said, "They wanted me to fit their purposes of insurance."  She explained that she was no longer allowed to circle the name of the physician that saw the patient if that physician was not covered by Medicare/Medicaid.  She said EHC had few Medicaid physicians on staff.  She said they continued to file Medicaid billing for urine testing under physicians' names, "who already quit awhile back".  She said her boss, Becky Hughes, told her to stop putting doctors' names on the paperwork. She said she didn't want to lie for anyone and therefore lost her job. AT1 specifically referenced Dr. McFarlane when asked which physicians' names were being used after they departed EHC.

31

67.     I have interviewed Dr. Erin Hood, a former EHC physician, on two occasions.  Dr. Hood told me she is not aware of anyone misusing/forging her signature.  She said she personally signed prescriptions and UDT request forms and she only signed UDT forms for patients that she personally met with.  However, she said in the Fall 2018, Dr. Matthew Rasberry received calls from an insurance/Medicaid official who was asking about patients Dr. Rasberry had never seen.  She said this upset Dr. Rasberry because he learned EHC was using his name on UDT requests for patients he had not seen.

68.     I have reviewed many American Toxicology drug screen results pages contained in the EHC patient files received from Crossroads.  They often have conflicting information when compared with the EHC patient file itself.  For example, EHC patient "FE" went to EHC on 6/21/18.  The patient evaluation form indicates FE was seen by Dr. Stephen Cirelli, however the American Toxicology reports show the "Requesting Party" as Dr. Erin Hood.  Also, patient "JM" was seen throughout 2017 and 2018 and the Requesting Party for the UDT is frequently listed as Dr. Robert Taylor although the patient files show JM was treated by physicians other than Dr. Taylor.  Such discrepancies were common to find in the patient files.

69.     One significant finding in the files was the use of former EHC physicians as the "Requesting Party" on the American Toxicology results pages, even on dates well past the time those physicians had left EHC.  Dr. McFarlane told me she stopped working

32

for EHC in October 2016. However, I have reviewed many American Toxicology results pages that list Dr. McFarlane as the Requesting Party for EHC UDT well after that time. Some examples include: The results pages for patient "AH" show Dr. McFarlane as the Requesting Party for samples collected/tested in January and February of 2019; EHC patients, "GG" and "TB" also have Dr. McFarlane's name as the Requesting Party for samples collected/tested in 2018. With little effort, I have located many other examples of Dr. McFarlane's name used as the Requesting Party well after her departure from EHC. I have also reviewed Medicare billing data which shows that Dr. McFarlane was the "referring provider" for many tests performed by American Toxicology and billed to Medicare well after October 2016. I have recently spoken to Dr. McFarlane and she confirmed that in her current practices, she does not make submissions to American Toxicology, and therefore it can be concluded that the submissions to Medicare (via American Toxicology) in Dr. McFarlane's name since late 2016 likely represent fraudulent activity.

70. Additionally, I have come across several examples in which Dr. Cyrus Erikson's name is listed as a Requesting Party well after his departure in 2016. Given the relatively small amount of files I have reviewed, compared to the patient population at EHC, I believe the use of incorrect names listed as Requesting Party on American Toxicology forms is vast and widespread. During my discussion with Director Guise, she conveyed that any false statement on the supporting documentation for a Medicaid

33

claim would be a concern and the claims would not have been paid had these findings been known to Medicaid.

*Excessive Billing for Presumptive and Definitive Testing*

71.     As previously noted in this affidavit, Medicare and Medicaid consider medically necessary, and therefore appropriately reimbursable, definitive testing of substances that produced unexpected results during presumptive testing.  Conversely, routine definitive testing of substances that did not yield unexpected results during previous presumptive testing is not medically necessary and is not appropriately reimbursable by Medicare and Medicaid.

72.     During an interview with investigators in December 2018, Dr. Herrell stated that EHC uses drug test strips (often referred to as dip-stick tests and/or point-of-care tests) to test for some drugs and the urine samples were then sent off for additional testing.  During an interview with Lori Barnett, also in December 2018, she said EHC used "dip-stick" tests in-house but due to those test being inaccurate, the samples were then sent to an outside lab.

73.     Based on a review of patient files received from Crossroads, documents seized from EHC and claims data received from HHS, I know that EHC and/or American Toxicology employees very often ordered both presumptive testing and definitive testing for EHC patients.  This, in conjunction with the above statements by Dr. Herrell and Barnett, demonstrates that EHC patients' urine samples may have been tested as many as

34

three times. During discussions with Dr. McFarlane, she too referenced the point-of-care (dip-stick) tests. When I informed Dr. McFarlane that many of the samples were then sent for two additional tests (presumptive and definitive), Dr. McFarlane said it was logical to send for confirmation testing of the dip-stick tests, but she could not rationalize why both a presumptive and definitive test would be ordered. Dr. McFarlane stated that the physicians at EHC did not make the decisions on what tests were ordered.

74.    The test results in the patient files suggest that it was EHC's common practice to receive a definitive test for nearly all patients and all samples. If it was given that a definitive test would be performed, there is no justification for also ordering the presumptive test, as the definitive test would contain all of those same results, and more. The necessity for this less-inclusive test is even further compounded when one considers that the sample likely already underwent an on-site dip-stick test, which is also a presumptive test.

75.    Based on the documents reviewed to date, it is not entirely clear to me if the presumptive and definitive tests were done consecutively or concurrently, although it appears they were done concurrently because the "Test Date" on the results pages for the tests most often show the same date. If, in fact, the tests were done concurrently, it again significantly raises the question as to the necessity of the presumptive test given that the definitive test would contain all of those results, and more.

35

76.     Even if the tests were done consecutively (presumably the definitive to confirm the presumptive) there would still be no explanation as to why definitive tests were ordered on the occasions when the presumptive tests showed no unexpected outcomes.

77.     While in many cases there were unexpected results (or failed screens) in the presumptive test, which could justify definitive testing, I have found many examples in my review of patient files where no unexpected results were found, yet the definitive test was still performed.  Examples of this are frequent and easy to locate in the patient files received from Crossroads.  It is more difficult however to determine when such examples were billed to Medicaid, Medicare and/or private insurances.  Below are some examples that I have cross referenced with the Medicare/Medicaid billing data provided to me by HHS, to ensure these examples were submitted to Kentucky Medicare/Medicaid for funding.

-    Patient "JM" went to EHC monthly in 2018.  On at least  7/20/18, 9/14/18, 10/12/18 and 11/9/18, JM's presumptive tests had no unexpected results, yet definitive tests were performed and billed to Medicaid.  The American Toxicology results pages have no name in the "Requesting Party" fields.  The EHC patient file shows JM saw Dr. Erin Hood on three of those occasions and Dr. Stephen Cirelli on one occasion.  In the Medicare/Medicaid billing data, only one date (7/20/18) has a "provider" name and it is Helen Bidawid.  (Note:

36

I know from interviewing Dr. Hood that she is a Medicaid provider. During that interview, she said EHC ensured that she didn't see Medicaid patients at EHC, in order to stay compliant with Medicaid regulations. That however appears to be incorrect, as JM is a Medicaid patient.)

- Patient "AM" was seen monthly at EHC in 2017 and 2018. On 11/3/17, AM's presumptive test had no inconsistencies, yet a definitive test was performed. Both tests were billed to Kentucky Medicare/Medicaid. The EHC files shows that AM met with Dr. Matthew Rasberry that day. The American Toxicology results pages show that Dr. Herrell requested both tests. The Medicare data shows Dr. Rasberry as the provider. On 12/2/17, AM's presumptive test had no inconsistencies, yet a definitive test was performed. Both tests were billed to Kentucky Medicare/Medicaid. The EHC files shows that AM met with Dr. Matthew Rasberry that day. The American Toxicology results pages show that Dr. Herrell requested both tests. The Medicare billing data has Dr. Rasberry as the provider. On 01/03/18, AM's presumptive test had no inconsistencies, yet a definitive test was performed. Both tests were billed to Kentucky Medicare/Medicaid. The EHC files shows that AM met with Dr. Danny Robinson that day. The American Toxicology results pages show that Dr. Herrell requested both tests. The Medicare billing data lists Dr. Rasberry as the provider for the presumptive test and Dr. Stephen Cirelli as the provider for the definitive test. (Note: On occasions such as these, where 4 different

37

physicians are referenced for a single trip to EHC, and the subsequent lab

billing, the inconsistencies make it very difficult for investigators to fully

analyze the suspected fraud, and further establishes the need to obtain/analyze

records maintained by American Toxicology.)  On 6/2/18, AM's presumptive

test had no inconsistencies, yet a definitive test was performed.  Both tests

were billed to Kentucky Medicare/Medicaid.  The EHC files shows that AM

met with Dr. Matthew Rasberry that day.  The American Toxicology results

pages show that Dr.  Rasberry requested both tests.  The Medicare billing data

has Dr. Rasberry as the provider.

-   Patient "RT" was seen at EHC on a monthly basis in 2018.  On 6/15/18, RT's

presumptive test had no inconsistencies, yet a definitive test was performed.

Both tests were billed to Kentucky Medicare/Medicaid.  The EHC files shows

that RT met with Dr. Bobby Joe Lee that day.  The American Toxicology

results pages show that Dr. Hood requested both tests.  The Medicare billing

data lists Cyrus Erikson as the provider for the presumptive test and Helen

Bidawid as the provider for the definitive test.  (Note: Again, four different

listed providers.)  On 7/13/18, RT's presumptive test had no inconsistencies,

yet a definitive test was performed.  Both tests were billed to Kentucky

Medicare/Medicaid.  The EHC files shows that RT met with Dr. Hood that

day.  The American Toxicology results pages show that Dr.  Hood requested

both tests.  The Medicare billing data lists Helen Bidawid as the provider for

38

the definitive test. The presumptive test was only billed to Medicaid and has no listed provider. On 7/27/18, RT's presumptive test had no inconsistencies, yet a definitive test was performed. Both tests were billed to Kentucky Medicare/Medicaid. The EHC files shows that RT met with Dr. Herrell that day. The American Toxicology results pages show that Dr. Herrell requested both tests. The Medicare billing data has Helen Bidawid as the provider for the definitive test. The presumptive test was only billed to Medicaid and has not listed provider.

- On 5/1/18, EHC patient "DD" had a presumptive test with no inconsistencies, yet a definitive test was performed. The EHC files shows that DD met with Dr. Matthew Rasberry that day. The American Toxicology results pages show that Dr. Robert Taylor requested both tests. The Medicaid billing data has no record of funding the presumptive test but does show the definitive test was billed to Kentucky Medicaid and the referring physician is listed as Dr. Robert Dukes.

78.     My review which discovered the above examples, and many more similar examples not provided, was limited to a portion of the patient files provided by Crossroads, in addition to documents seized from inside the clinic, and only represent a small percentage of testing that was performed at American Toxicology, for EHC. Given the ease in which these examples were located, I believe the excessive testing (and corresponding use of multiple physician names) is likely widespread throughout the EHC

39

patient population. I believe a search of documents, both physically and/or digitally maintained by American Toxicology will allow investigators to more thoroughly detect the full scope of excessive testing and the corresponding billing associated with the testing.

*Overall Concern of Medical Necessity for the EHC UDT*

79.     In addition to the above, I believe the UDT associated with EHC can, in general, be deemed as not medically necessary, and therefore not authorized to be funded by Medicare/Medicaid. I base this on my discussions with former EHC patients, former EHC employees and an examination of the patient medical charts and other documentation located and seized during the search warrants at EHC, which collectively have revealed that regardless of the UDT results, EHC patients were very likely to continue receiving the same medical care at EHC. Although there is definitely evidence that patients failing UDT at EHC were often required to have more frequent appointments at EHC, the vast majority of the patients continued to receive the same medications and continued as patients (not dismissed) regardless of the UDT outcomes. Many patients continued to fail, in fact some failed more often than passed, however they remained patients at EHC. Based on records collected at EHC during the search warrants, I have the following examples to provide, although these are just a sample of the many examples both known and yet unknown to investigators.

- Between the dates of 7/2/18 and 11/2/18, EHC patient "RB" had approximately 11 drug screens. On nine of those tests, RB had the presence of an opioid other than Suboxone.

- Between the dates of 3/15/17 and 10/4/18, EHC patient "SC" had approximately 33 drug screens. Of those results, 26 were classified as either a "lapse" or "unexpected outcome", meaning non-prescribed drugs were present and/or prescribed drugs were not present. Of those failed tests, 16 showed positive for the presence of an opioid other than Suboxone.

- Between the dates of 6/16/17 and 12/7/18, EHC patient "MS" had approximately 37 drug screens. Of those results, 33 tests were positive for the presence of methamphetamine or amphetamine, often times both.

- Between the dates of 10/10/16 and 11/5/18, EHC patient "EM" had approximately 36 drug screens. Of those results, only 7 are listed as "passed" and 25 of the tests were positive for cocaine.

- On a drug screen results page for patient "TC" located and seized from EHC on 12/13/18, the notation "Last passed UDS" is written next to the tested dated 12/30/16. It appears the page was printed on 10/15/18 and it indicates TC had been to EHC approximately 20 times since the last passed drug screen.

80.    Investigators have interviewed several former EHC employees, including physicians, which have indicated failed drug screens did not lead to the dismissal of EHC patients.

41

81.     A former EHC employee, the aforementioned "EHC1", who was involved in administrative tasks during her employment, was asked if patients were dismissed for diversion; she replied, "No, not really." EHC1 said some patients have been dismissed due to failed drug screens but not for failed pill counts. EHC1 was asked who made those decisions. EHC1 said she would call the patients for the pill counts herself; if the request resulted in a no-show or a failed pill count, no one was ever cut off and that was Lori Barnett's decision. EHC1 said if an EHC physician wanted to dismiss a patient, the physician was not allowed to do that themselves; that decision had to be made by Barnett. She conveyed that it was not common for Barnett to dismiss a patient. EHC1 said she dismissed two patients for being very rude but patients were not dismissed for failed drug screens. She said there were occasions when physicians would refuse to see a patient and Barnett would re-schedule the patient to see a different physician.

82.     Below are portions of my discussion with Dr. Keri McFarlane, former EHC physician, regarding patients failing drug screens at EHC and the process of dismissing, or "firing" patients. (SU = myself, KE = Dr. McFarlane, DI = Diversion Investigator Michael Hughes)

SU: Were you allowed to boot someone from the clinic without them? Like could, did you have the authority to say you are no longer...
KE: Supposedly yes.
SU: Mhmm.
KE: But no. Because I fired multiple people and they ended up on someone else's schedule.

        Later in the conversation...

42

KE: So, if I would go and say hey this patient needs to be fired. And I would like fire the patient. All of a sudden, I saw them like a month later, and they're, they were on someone else's schedule. And I'm like, what the hell, I fired the patient. Why?

SU: For a good reason.

KE: For good reason.

SU: Mhmm.

KE: Why is the patient back?

SU: Do you feel then, she's almost turning a blind eye to the diversion, or?

KE: Yeah, I'm just saying as a physician.

SU: Yeah.

KE: And I'm telling you that this patient needs to be fired and I'm no longer seeing this patient and you just take the patient and put them with another physician.

SU: How often did that happen?

KE: Mmm quite a few times.

SU: Like more than five?

KE: Oh yeah.

SU: And that was Lori specifically?

KE: Oh yeah. She was in control of the schedule, she was in control of what, what doctor saw what patient and when they were scheduled.

SU: Okay.

KE: What day they worked.

DI: When you brought that to her attention what did she say?

KE: "Oh well I talked with them and we're going to give them another chance" and blah, blah. I'm like, you know, I...I'm, I'm the queen of forgiveness, I give them a three strikes and you're out.

SU: Yeah.

KE: That, that's my feeling on it.

SU: Three failed drug strikes or urine strikes.

43

DI: What did Taylor say when you brought it to his attention?

KE: He wasn't there to bring it to.

DI: He wasn't there, okay.

KE: Everything had to go through Lori, that's what I was told.

SU: Okay.

KE: Specifically, from Rob, everything went through Lori.

     Later in the conversation....

KE: I was put in my place, I was told how, what I was going to do, that Lori was running it, that my patients were not my patients. Cause I even went to them a couple of times and said listen this patient needs to be fired. I even went to Rob and I said I just saw that patient come back, why is that patient back here?

SU: Mhm.

KE: And he had said, oh well Lori talked to the patient and we decided that we're going to put them with them because you obviously have a personality conflict with them.

83.    During one of my two discussions with Dr. Erin Hood, she said she dismissed patients while employed at EHC. I later asked Dr. Hood to approximate how many patients she dismissed during her two years of employment; Dr. Hood said, "probably three." She said she fired the patients because the patients, "never really passed (drug) screens", she added that the patients were "not even trying to hide" their non-compliance with the treatment/sobriety. Of the patients that had never passed their tests, which she ultimately dismissed, I asked why the patients weren't previously

44

dismissed. Dr. Hood said it was the first time she had seen those patients, and upon seeing their previous UDT results, she told Dr. Herrell those patients needed to be dismissed. She said there were protocols at EHC regarding failed UDT, which included increasing the frequency patients had to come in and then dismissing the patients that continued to fail, but those protocols were not being followed. She noted some of the failing patients had not even been moved to bi-weekly visits but remained on monthly visits. Regarding patients who continued to test positive for stimulants, she said the protocols called for physicians to prescribe those patients "supportive medications." Dr. Hood said the three aforementioned patients that she dismissed all continuously tested positive for opiates and/or other illicit drugs. She later said she did not confirm if those patients were truly dismissed from EHC, or just placed with a different physician on their next visit.

84.     In September 2019, I spoke with a former EHC administrative supervisor (EHC3) who is currently an employee of Crossroads. During the discussion, EHC3 stated that patients were rarely dismissed at EHC. I asked EHC3 to estimate the number of EHC patients dismissed during her five years as an EHC employee; EHC3 estimated that more than 10 but less than 20 patients were dismissed during those five years. Therefore EHC3, an administrative supervisor who had vast knowledge of the EHC operations, believes on average, approximately 3 EHC patients were dismissed each year. Given the fact that EHC had over 1,000 patients, this further demonstrates that the UDT had little/no impact on the medical decisions. EHC3 also said that physicians could not

45

dismiss patients and only Dr. Taylor and Barnett could make those decisions. She stated that on several occasions, physicians were led to believe they had dismissed patients but the patients were actually re-scheduled with different physicians. It is also noteworthy that when I asked EHC3 how many patients were referred to a higher level of care, based on failed drug screens, EHC3 replied, "[n]ot very many at all."

85. It should be noted that two DEA confidential sources (CSs) who made controlled visits to EHC on behalf of the DEA were dismissed as patients. This was detailed thoroughly in the incorporated affidavit. It was also detailed that both CSs were previous and longstanding EHC patients prior to their cooperating with DEA and that their dismissals for failed drug screens was inconsistent with the past behaviors of the EHC personnel, as the CSs' medical files showed they had consistently failed the drug screens in the past. The incorporated affidavit notes that the EHC staff may have been aware of the CSs' cooperation, in part, because one of the CSs stated he/she believed EHC employees were speaking in the hall and discussing the possibility that he/she was cooperating with law enforcement. Since the time that affidavit was written, I have now discovered through discussions with a two former EHC employees (EHC1 and EHC3), and corroborated through text messages saved on EHC1's phone, that EHC had been advised by a pharmacist in Kentucky that the CSs were cooperating with law enforcement and the decision was made to fire/dismiss the CSs as patients. Therefore, I do not believe those dismissals are a true reflection of the practices occurring at EHC. Instead, I believe EHC used the failed drug tests as a pretext to get rid of the cooperating

46

patients to limit the investigators' ability to continue investigating EHC. In fact, I believe the CS's repeatedly failed tests, with no dismissals (up until the tip was received from the Kentucky pharmacist) is indicative of the EHC culture; failed drug tests had little to no consequences.

86.     This leads to my conclusion that the test results were not being used to make medical decisions, and therefore were not medically necessary and the billing of these tests was fraudulent.

*Motive*

87.     In order for EHC to practice addiction treatment, it had to conduct UDT to maintain the appearance of a standard of care. The cost of these tests inevitably fell upon the clinic, the patient or insurance. Based upon the interviews with Dr. Taylor and Lori Barnett, I know that EHC did not provide any money to American Toxicology, and therefore EHC was not paying for the tests. Furthermore, during the interviews I was told EHC did not collect money from the EHC patients for the labs, therefore I know that if/when American Toxicology was compensated for the labs associated with EHC, American Toxicology had to collect funds from insurance entities and/or bill the patients directly (especially necessary for non-insured patients).

88.     I do not believe American Toxicology was receiving substantial payments from directly billing EHC patients for the lab services. In some of my interviews of former EHC employees it has been brought up that, at times, some patients have received

47

bills for the lab testing, although it is not entirely clear if these bills represented full costs (for the uninsured) or required co-pays for the insured, or a combination of the both. When I spoke with the aforementioned "EHC3", a former EHC administrative supervisor, she recalled some patients complaining that they had received bills from American Toxicology and advised Barnett of the issue; EHC3 said Barnett said the patients should not be receiving bills and said she (Barnett) would speak to "Mike" (Dube) about the complaints. When I spoke to Dr. Keri McFarlane regarding this subject she said, "I was told, the way I was told was to tell my patients, when I was there was that you'll get 3 bills. Ignore them, they won't send you to collections, they'll work out a deal." However, based on the discussions with Dr. Taylor and Lori Barnett, I believe no "deal" was ever reached and the vast majority of the billing from American Toxicology to EHC patients went unpaid/ignored. I base this belief upon: 1) the EHC patient population is comprised of drug addicted persons, the majority of which rely upon government subsidies for income/care and therefore have little money to provide to American Toxicology; 2) Even if the patients did have the funds to pay the American Toxicology bills, if they were given advice from EHC employees to ignore the bills, it is very likely that advice was followed, as it benefited the patient.

89.     Therefore, this leads to the conclusion that American Toxicology's primary (if not sole) income derived from preforming tests for EHC patients was insurance, including Medicare/Medicaid. Based on that conclusion, I believe EHC was receiving the benefit of free UDT for certain uninsured or underinsured EHC patients from

48

American Toxicology. For instance, I know that our undercover investigator who attended several visits at EHC provided no insurance information to EHC. Yet, in review of the undercover's patient file, received from Crossroads, I see that American Toxicology conducted urine analysis for each undercover visit. The undercover was never asked to pay an additional amount other than the cash price at EHC. If Dr. Taylor was honest/correct in saying that EHC never provided money to the lab for services, this would be one example of many uninsured EHC patients that had tests performed although EHC and its patients incurred no costs. Certainly this would be a great benefit to EHC, because if the costs of the tests fell upon EHC, the ownership would lose profits or be forced to increase their visitation costs and risk losing customers/patients.

90. Following my interview with Dr. McFarlane, she provided me with some emails she had maintained pertaining to her employment with EHC. One of those emails was titled, "Fwd: Axis Diagnostic Letter". The email had been forwarded to Dr. McFarlane, Dr. Herrell and Dr. Mark Grenkoski on March 11, 2015. The email contained an attachment which was a letter sent to EHC from AXIS Diagnostics (Lab). In the body of the email, Dr. Taylor wrote, "Time for another fight. Look at below letter from the Hematology lab. Their position being now that they are gone all unpaid noninsured should be paid by EHC. They will be meeting EJ tomorrow. Will keep you updated. Thanks, Robert." The attached letter from AXIS indicated that patients, without insurance, were not paying their obligations to Axis and therefore Axis was seeking reimbursement from EHC, in the amount of $55,380. AXIS threatened to

49

send the balance to collections. I found this document significant because if American Toxicology, like Axis, was not able to successfully collect funds directly from the EHC patients, then those tests were in fact going unpaid and this letter from Axis shows what other labs, not as friendly to EHC, may take in order to recover their costs.

91.     In August 2019, I spoke with a former EHC employee (EHC2) whose statements further emphasized this point. EHC2 stated that before she became an EHC employee, she worked for Quest Labs and was positioned inside the EHC Jacksboro location, in approximately 2015. She said Quest collected and processed blood samples from some EHC patients and also processed some of the urine samples. She said Quest began having difficulties collecting money for the work they were conducting because insurances were not paying for the labs, due to EHC being a cash-only business. EHC2 said EHC attempted to make arrangements with Quest in which Quest would conduct some labs without pay and Quest "absolutely" refused to practice in that manner, which ultimately led to Quest withdrawing from EHC altogether. EHC2 said American Toxicology then began doing all of the labs for EHC.

92.     The proceeding paragraphs demonstrate just how substantial of a benefit it was to the EHC ownership that American Toxicology performed UDT without payment and without consequences to EHC and/or its patients.

93.     In turn, American Toxicology has also benefited from its partnership with EHC. As detailed above, American Toxicology has received over $5,000,000 from

50

Kentucky Medicare/Medicaid and undoubtedly additional funds from Tennessee Medicaid/Medicare and private insurances for processing UDT for EHC patients. Although the evidence, to date, suggests that American Toxicology processes many drug tests for EHC without compensation, the evidence also suggests that American Toxicology processes many unnecessary definitive tests for EHC, of which American Toxicology receives substantial compensation.

94.     In addition to the financial incentives listed above for each business/owner, there may be additional benefits/agreements between Dr. Dube and Dr. Taylor that is yet unknown to investigators. Their close relationship, depicted in their text messages, and the aforementioned exchange of $50,000 between the parties certainly shows the potential for such an agreement. Additionally, Dr. Taylor's clear deceptiveness when speaking to me about the lab demonstrates his desire to deter law enforcement from examining the relationship between the businesses and/or owners.

*Additional Corroboration of Concerning Activities*

95.     Further corroborating that fraudulent activity was taking place between EHC and American Toxicology, EHC3 (a current Crossroads employee) told me that Crossroads terminated its relationship with EHC due to concerns about its billing practices.

96.     According to EHC3, when Crossroads learned of Dr. Rasberry's complaint that his name was being used for insurance billing of patients he never saw (as previously

51

mentioned by Dr. Hood and documented above), Crossroads requested that EHC3 help perform an audit of the lab billing, with specific emphasis on the names that were being submitted as the "referring providers". EHC3 said the audit confirmed American Toxicology's misuse of physicians' names on requisition forms. EHC3 said the forms were supposed to show the names of the physicians actually seen by the patients, however names were, at times, changed to reflect the names of physicians that were covered by specific insurance plans. EHC3 said this audit occurred approximately 2-3 months ago and resulted in Crossroads immediately dropping American Toxicology. It is also noteworthy that EHC3 said Crossroads now contracts with a large lab company and that company bills Crossroads for each non-insured patient that is tested; this again demonstrates that EHC was receiving a substantial benefit from American Toxicology's free testing.

97.    Based on the facts set forth above, there is probable cause to believe that individuals associated with EHC and American Toxicology have: (1) Conspired to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846; (2) Conspired to Commit Health Care Fraud, in violation of Title 18, United States Code, Sections 1347 and 1349.

## Probable Cause Related to Each Target Location

### *Target Location #1 – (American Toxicology)*

98.     In order to fully determine the level of fraud committed in this case, it is necessary for investigators to obtain copies of the completed requisition forms used by American Toxicology.  Furthermore, investigators are seeking to locate financial documents that show American Toxicology's accounts payable, amounts received and amounts written off.  Additional items such as policies and relevant communications, more thoroughly detailed below and in the attachments are also sought.  It is the belief of investigators that many of these items will be located at the lab itself, Target Location #1.

99.     I have spoken with a former American Toxicology employee, the aforementioned "AT1".  AT1 told me the urine samples collected at EHC were sent, via Fed Ex, to the American Toxicology lab in Johnson City, TN.  She said the samples were accompanied with the original request forms and no copies of those forms were kept at EHC.   She said she was told by American Toxicology supervisors not to scan those forms into the EHC digital platform (Salesforce).  Because these forms were mailed to Target Location #1, I believe these forms, or digital duplicates of the forms, remain at Target Location #1.

100.    As detailed in the incorporated affidavit, investigators know that EHC utilized a third party company, Salesforce, to digitally store EHC patient records and other EHC data.  In July 2018, I sought and obtained a search warrant authorizing Salesforce to provide EHC records to the DEA.  Part of the production from Salesforce were records detailing when EHC personnel had logged onto the EHC Salesforce

database. Those records provide the times, dates, and Internet Protocol ("IP") addresses that individuals utilized to log into the database. The records received included log-in records up to June 2018. From a review of those records, I see that the email address americantoxicology@yahoo.com was regularly used to logon to the EHC server, via three different IP addresses. Based on an open internet search, I was able to determine two of those IP addresses are associated at/near the vicinity of the two EHC locations. Therefore, those likely represent the work that was being done by the American Toxicology employees that worked inside each respective EHC location. The third IP address, 75.130.55.74, was found to be associated with Johnson City, TN. Pursuant to an Administrative Subpoena, I received records from Charter Communications that the IP address was subscribed to "American Toxicology Labs" with the listed address of Target Location #1. This confirms that employees inside Target Location #1 were accessing the EHC server and further confirms this is the location that the samples and requisition forms were being mailed to.

101.     During my discussion with EHC3, she also confirmed that EHC/Crossroads did not retain copies of the lab requisition forms and that the original forms were mailed to American Toxicology with the urine samples, daily. As previously detailed, according to EHC3, approximately 2-3 months ago she aided in performing an audit for American Toxicology's insurance billing associated with EHC/Crossroads patients. Per EHC3, as part of the audit, Crossroads requested some requisition forms from American Toxicology and American Toxicology complied and provided the documents to

54

Crossroads. This confirms that American Toxicology is in possession of requisition forms that are of significant interest to this investigation.

102.     Through communications with HHS, I know that federal regulations and CLIA require labs to retain certain documents, including requisition forms, for two years; and furthermore insurers often require the same preservation for up to five years. Therefore, it is probable that American Toxicology maintains possession of a substantial amount of requisition forms that relate to the billing of tests performed for EHC/Crossroads.

103.     In addition to the above, I also believe records regarding direct patient billing for testing and co-pays will be located at Target Location #1. These records will help investigators determine: 1) How many tests were performed by American Toxicology that were not paid for at all and therefore were a free service continuously provided to EHC; 2) Were patients paying co-pays required for the services funded by some insurances entities.

104.     Moreover, I know from my training and experience, and from consultation with other experienced law enforcement officers, that medical facilities almost always keep records of their activities, including records relating to patient care. I also know from my consultation with other law enforcement agents that clinical laboratories typically maintain records of their business activities, including laboratory requisition forms (the forms providers use to order tests), tests results and billing information.

55

105.    I also know, based on my training and experience, and after consultation with other law enforcement agents, that:

a.      Persons involved in the health care industry maintain a large amount of information on computers. They utilize an electronic medical records system that provides detailed information such as what services the patients received, who was the treating physician, billing, payment, and location of treatment, among other information.

b.      The majority of Medicare, Medicaid and general insurance claims are submitted electronically via computer;

c.      Medicare, Medicaid and private insurance companies maintain websites that provide education materials and claim-submission assistance to medical providers;

d.      Many companies conduct business transactions such as banking, product ordering, travel, payroll, and more via computers;

e.      Electronic medical records, diagnostic readings, and prescriptions are becoming increasingly popular with health care professionals;

f.      Persons involved in criminal activities often conceal information in their computers;

g.     Persons involved in criminal activities commonly maintain in their businesses the following:  notes, phone numbers, memorandums, books, papers, patient files and business documents relating to the criminal activity and/or associates involved in the illegal activity, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

106.    Accordingly, I am requesting authority to seek any and all UDT records related to EHC and EHC's patients, in any form,[2] including but not limited to orders, requests, results, as well as any records or documents associated with CLIA, or any other accreditation entity, including certifications, are relevant to this investigation.  In particular, based on the foregoing and my investigation to date, I believe there is probable cause to believe that the following types of evidence are likely to be found at Target Location #1:

---

[2] In March 2018, investigators obtained prescription records for a pharmacy in Tennessee identified as a common location for EHC's Tennessee patients to fill their prescriptions. Those records indicated that Tennessee patients received similar types of prescriptions, including, frequently, 3 doses of buprenorphine per day, often combined with a benzodiazepine.  A preliminary review of EHC's data from Tennessee's Prescription Drug Monitoring Program similarly shows that there does not appear to be a material difference in how EHC prescribes to Tennessee patients versus Kentucky patients.  It also appears that EHC does not assign different physicians to see Tennessee or Kentucky patients.  Accordingly, I respectfully submit there is probable cause to review records for patients regardless of their state of origin.

107. **_Hard Copy Records_**.  As noted, multiple witnesses have also told me that hard copy records, including lab requisition forms, were regularly sent to American Toxicology's offices at Target Location #1.  I seek to seize any records that pertain to UDT performed on behalf of EHC, including but not limited to documentation of tests performed, the results and funding billed/received for the testing.  I also seek to seize any documents, notations or other records that contain: communications/coordination with EHC employees/ownership; the name(s) of EHC physicians; EHC work schedules; and records of payments made between EHC (or Dr. Robert Taylor, or Lori Barnett) and American Toxicology (or Dr. Micheal Dube, or Regan Dube).

108. **_Electronic Records on Servers or Individual Computers._**  Based on my training and experience, as well as my investigation to date, I believe Target Location #1 will contain individual computers or servers on which evidence is likely stored.  Like most businesses, I know from consulting with other knowledgeable law enforcement officers, including HHS agent(s), it is common practice for clinical laboratories to utilize computers and/or servers for everything from internal communications, to storing lab requisitions, to processing laboratory test results and submitting claims for reimbursement to insurers.  Among other things, employees typically use computers to display the findings and results of UDT.   Given the types of tests for which American Toxicology has repeatedly billed, it is likely that the practice uses one or more computers to run and display results from the analyzer(s) and to store the results of tests.  Based on my experience, it is also likely that many of these documents were created or viewed in

58

electronic form, and emails or attachments likely stored on individual employees'
computers. Moreover, as noted, EHC3's recent interactions with American Toxicology
have confirmed that American Toxicology has stored documents relating to UDT for
EHC's patients and has sent them to EHC (and its successor company) via e-mail. This
confirms that American Toxicology has stored relevant documents in an electronic
format and used e-mail to communicate about these matters.

109.    ***Employee Records***.  I seek to seize any employee records located at the
Target Locations.  I believe these files will aid investigators in identifying current and
former employees that investigators will then seek to interview in order to learn of their
experiences, and possible culpability, while working at American Toxicology.

## *ELECTRONIC STORAGE AND FORENSIC ANALYSIS*

110.    As described above and in the accompanying attachments, this application
seeks permission to search for records that might be found in Target Location # 1, in
whatever form they are found.  One form in which the records might be found is data
stored on a computer's hard drive or other storage media.  Investigators seek to seize and
search these digital storage devices to further this investigation.  Thus, the warrant
applied for would authorize the seizure of electronic storage media or, potentially, the
copying of electronically stored information, all under Rule 41(e)(2)(B).

111.    *Probable cause.*  I submit that if a computer or storage medium is
found at Target Location #1 reasonably identified as having been used by individuals

involved in American Toxicology's operations, there is probable cause to believe that the records sought will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used

60

it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on the evidence related to this investigation outlined above, including the statements of EHC3, I am aware that computer equipment was used to generate, store, and/or print documents used in the potential health care fraud scheme.  There is reason to believe that there is a computer system currently located at Target Location #1.

112.  *Forensic evidence.*  As further described in the accompanying attachments, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium reasonably identified as having been used by individuals involved in American Toxicology's operations because:

61

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet

62

history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was

63

created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along

64

to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

113. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from Target Location # 1, it may be possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

66

c. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

114. *Nature of examination*. The undersigned recognizes that seizure of a company's computers may limit its ability to conduct business. As with any search warrant, the agents assigned to this matter will execute this warrant in a reasonable fashion. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media may need not to be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If company employees so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

115. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

67

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### *Target Location #2 – (Dube Residence)*

116.    The investigation has revealed that Dr. Dube and his wife, Regan Dube, maintain a primary residence at Target Location #2.  Both Dr. Dube and Regan Dube have active Tennessee driver's licenses that have Target Location #2 listed as their address.

117.    As previously detailed, according to AT&T, the Target Telephone, which is used by Dr. Dube, is subscribed to "American Toxicology Lab" of "113 Sterling Springs Dr, Johnson City, TN 37604".

118.    I know from documents received BB&T bank that American Toxicology maintains an active account at their institution and the mailing address for that account is Target Location #2.  Furthermore, I know that Dr. Dube wrote the aforementioned $50,000 check to Dr. Taylor from a personal account which is also held by BB&T and also has Target Location #2 as the mailing address.  Therefore, Target Location #2 is likely to location Dr. Dube maintains financial records that are being sought to seize in this application.

119.    As previously detailed, I know from a search of the Tennessee Secretary of State public website that "American Toxicology Labs, LLC" is an active business and the

68

"Principal Office" and "Mailing Address" are both "113 Sterling Springs Dr, Johnson City, TN". The "Registered Agent" is "Regan Dube" of "113 Sterling Springs Dr, Johnson City, TN".

120. Investigators have conducted an open search of Regan Dube's Facebook page. On that page, Regan lists that she is the "Owner of American Toxicology Laboratories" and further lists that she is a "Stay-at-home parent" and therefore it can be inferred that Regan Dube, the "Registered Agent" for American Toxicology uses Target Location #2 as a place to conduct administrative duties associated with American Toxicology.

121. As part of this investigation, I sought the aid of the United States Postal Inspection Service. In response, starting in August 2019, a "mail cover" was initiated at Dr. Dube's residence, Target Location #2. I have subsequently received and reviewed images of the exterior of mail items received at that location. Those images show that Dr. Dube and Regan Dube regularly receive mail at Target Location #2. Those images also confirm that business and financial documents related to American Toxicology are being mailed to Target Location #2. For example:

- On 8/8/19, two pieces of mail addressed to "American Toxicology Labs LLC" were received at Target Location #2. The mail was sent by the "Tennessee Depart of Labor and Workforce Development" and "Aetna".

69

- On 8/9/19, one piece of mail addressed to "American Toxicology Labs LLC" was received at Target Location #2. The mail was sent by Blue Cross Blue Shield of Tennessee.

- On 8/13/19, one piece of mail addressed to "American Toxicology Labs LLC" was received at Target Location #2. The mail was sent by BB&T Bank.

- On 8/30/19, two pieces of mail addressed to "American Toxicology Labs LLC" were received at Target Location #2. The mail was sent by the "Social Security Administration" and "Med Pro Disposal".

- On 10/31/19, six pieces of mail addressed to "American Toxicology Labs LLC" were received at Target Location #2. Five of the mail items were sent by Blue Cross/Blue Shield of Tennessee and one of the items was sent by the "Kentucky Department for Medicaid Services, DXC.technology, Fiscal Agent".

122.    Probable cause exists that a search of the Target Location #2, Dr. Dube's primary residence and residence used to receive business and financial documents related to American Toxicology, will result in the seizure of documents of evidentiary value, possibly the Target Telephone and possibly assets that represent proceeds from the alleged conspiracy. Furthermore, I know from training and experience those individuals maintaining documents that reveal evidence of a criminal conspiracy most often store/maintain those documents inside their primary residence. In addition to the primary structure, investigators know that at least two large blue storage containers (or PODs) are

70

located on the driveway of the property. The containers were first observed by investigators in late July, when the last two photographs in Attachment C were taken. The first photo in Attachment C was taken on 9/23/19 when a member of law enforcement confirmed that the containers remain outside the residence on the driveway. Based on the longevity of the containers' presence, I believe Dr. Dube is using the containers to store items and perhaps storing documents related to his businesses, including American Toxicology. Therefore, I seek the authority to search these containers and other containers and/or outbuildings located on the property.

123. Because several people share Target Location # 2 as a residence, it is possible that Target Location # 2 will contain areas that are predominantly used by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those areas, the warrant sought would permit the seizure and review of those items as well.

### *Target Telephone – Dr. Dube's cellular telephone*

124. As detailed in this affidavit, Dr. Dube's has used (423) 946-4303 to communicate with Dr. Taylor, and according to AT&T, this cellular telephone is subscribed to "American Toxicology Lab" of "113 Sterling Springs Dr, Johnson City, TN 37604".

125. The text messages detailed in this affidavit demonstrate that Dr. Dube used this phone to communicate with Dr. Taylor regarding the activities occurring between

EHC and American Toxicology. Although those text messages stop at the time Dr.

Taylor's phone was seized by investigators, I know from records received from AT&T on

9/5/19, pursuant to an Administrative Subpoena, that the communication between the

Target Telephone and Dr. Taylor's same number (now ported to a new physical

telephone) remains ongoing and occurred as recent as late August. (Note: The records

only contained data up until 9/4/19). I believe the seizure and search of the Target

Telephone will result in additional communications that are of evidentiary value to this

investigation.

126.    Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

127.    *Forensic evidence.* As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when. There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a

file (such as a paragraph that has been deleted from a word processing file).

72

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

128. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

73

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

129.    Based on the foregoing, I request that the Court issue the proposed search warrants.

## REQUEST FOR SEALING

130.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for 180 days or until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jared Sullivan, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this _24_ day of September, 2019.

Dennis Inman
United States Magistrate Judge

74

## Attachment C

Target Location #2: 113 Sterling Springs Drive, Johnson City, TN

(Dr. Michael Dube's primary residence)

The premises to be searched is a single-family, multi-story, brown-brick home with black shutters and an attached three-car garage with storage containers located on the premises. The residence is positioned well off Sterling Springs Drive and has a long driveway. At the street, to the left of the driveway, there is a brick mailbox with an attached plate that reads "113 Sterling Springs Dr." Three photos of premises follow:







# **Attachment D**

*Things to be seized from:*

*Target Location #2: 113 Sterling Springs Drive, Johnson City, TN*

All documents, records and property that constitutes evidence of criminal acts in violation of 21 U.S.C. § 846, 18 U.S.C. § 1347 or 18 U.S.C. § 1349 from December 16, 2013 to the date the warrant is executed, including the following:

a. Any records or documents referring to EHC, an EHC patient, or an EHC employee/owner/physician

b. Records related to urine drug tests (UDT) that were performed on behalf of Express Health Care (aka EHC), including but not limited to documentation of tests performed, the referring physician/provider, the results, and the billing/payments for the testing

c. Documents that record payments made between EHC (or Dr. Robert Taylor, or Lori Barnett) and American Toxicology Labs (or Dr. Michael Dube, or Regan Dube).

d. Billing and deposit receipts/records, including records of any submissions to (or communications with) Medicare, Medicaid, or private insurers;

e. All records or information showing the identity of the individuals responsible for billing submissions to Medicare, Medicaid, or private insurers;

f. Bank account records, cash register reports, ledgers, wire transfer records, bank statements, tax records, tax returns, safe deposit box keys and records, vault key(s), safes, money wrappers, money containers, financial records and notes, showing payment, receipt, transfer, or movement of money relating to American Toxicology's operations;

g. Currency in excess of $1,000 that investigators can reasonably deem to represent proceeds of the alleged fraudulent activates occurring at American Toxicology.

h. Any computer, cellular telephone or other digital storage device that investigators can reasonably deem to hold digital evidence related to the alleged fraudulent activates occurring between American Toxicology and EHC (Note: For any such

seized item(s), investigators will submit a separate application for a subsequent search warrant that details the probable cause related to the specific device(s) prior to those items being searched.)

i.  Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes and documents, and other items which reflect names, addresses, telephone numbers, and communications regarding the diversion of controlled substances or defrauding a health care benefit program by Dr. Michael Dube and others;

j.  Indicia of occupancy, residency or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys; and

k.  The opening, search and removal, if necessary, of any safe or locked receptacle or compartment, including briefcases, as any of the property heretofore listed may be maintained.